Eric H. Spencer (#022707)
Ryan J. Regula (#028037)
Heather Dukes (#030161)
SNELL & WILMER L.L.P.
One Arizona Center
400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
Telephone: 602.382.6000
espencer@swlaw.com
rregula@swlaw.com
hdukes@swlaw.com
*Attorneys for Arizona Recovery Housing Association*

Steven G. Polin (*admitted pro hac vice*)
The Law Office of Steven G. Polin
3034 Tennyson Street, NW
Washington, DC 20015
Telephone: 202.331.5848
spolin2@earthlink.net
*Attorneys for Arizona Recovery Housing Association*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Arizona Recovery Housing Association, an Arizona not-for-profit corporation, <br><br> Plaintiff, <br><br> v. <br><br> Arizona Department of Health Services, an agency of the State of Arizona; Dr. Cara Christ, M.D., in her official capacity as Director of the Arizona Department of Health Services, <br><br> Defendants. | No. CV-20-00893-PHX-JAT <br><br> **AzRHA's Motion for Temporary Restraining Order and Preliminary Injunction** <br><br> **(Oral Argument Requested)** |

This case concerns facial and as-applied discrimination against recovering alcoholics and substance abusers, who are federally defined as disabled and handicapped, and the sober living homes that support them. Specifically, the Arizona Sober Living Homes statute and rules, set forth in A.R.S. § 36-2061 *et seq.* and A.A.C. R9-12-101 *et seq.*, impose harsher and more burdensome licensing requirements on sober living homes than those levied

against similar housing programs for other disabled persons. In this way, the Sober Living Homes statute and rules violate the Federal Fair Housing Act in 42 U.S.C. § 3601 *et seq.*, the Americans with Disabilities Act in 42 U.S.C. § 1201 *et seq.*, and the Federal Rehabilitation Act in 29 U.S.C. § 794.

Moreover, it is defendants Arizona Department of Health Services' ("DHS") and Dr. Cara Christ, M.D.'s ("Director Christ's") implementation and enforcement of these discriminatory provisions that has created the urgency necessitating a temporary restraining order and preliminary injunction. First, the Sober Living Homes statutes and rules (and the Defendants' enforcement of the same) have forced at least six Arizona Recovery Housing Association ("AzRHA") sober living homes to close. Second, DHS and Director Christ have begun serving administrative complaints seeking at least $77,000.00 in fines against AzRHA members for failure to pay the overly burdensome licensing fees. If such discriminatory actions are not stopped, few licensed sober homes in Arizona will be left to help individuals that need a supportive living community to overcome addiction.

Consequently, on behalf of its 177 sober living homes in the State of Arizona, AzRHA moves for a temporary restraining order and preliminary injunction to stop the discriminatory and improper actions of the Defendants, and the statute and rules that they rely on, until the Court has an opportunity to hear the case on its merits.

## **FACTUAL HISTORY**

### **Sober Living Homes**

AzRHA is an affiliate of the National Alliance of Recovery Residences ("NARR"), which is an organization that sets national standards for sober living homes. *See* Declaration of Gonzalo Ardavin ¶ 4. As a NARR affiliate, AzRHA trains and educates its members, conducts advocacy campaigns to ensure fair housing for members of the substance abuse recovery community, and inspects and certifies that member sober living homes meet the NARR national standard for health and safety. *Id.*

DHS and Director Christ have provided AzRHA the delegated authority to inspect and certify sober living homes on behalf of DHS. *Id.* ¶ 5. Consistent with that inspection

1  authority, AzRHA requires each of its sober living home members pay annual membership
2  and inspection fees to AzRHA. *Id.* ¶ 6. The initial AzRHA membership fee is roughly
3  $275.00 and the subsequent annual membership and inspection fees are roughly $125.00.
4  *Id.* Because DHS has delegated inspection authority to AzRHA, DHS bears no
5  administrative or financial burden to inspect and certify AzRHA sober living homes. *Id.* ¶
6  7. Thus, any DHS inspection of an AzRHA-certified sober living home is duplicative and a
7  waste of state resources. *Id.*

AzRHA has certified 177 sober living homes in Arizona as meeting the NARR national standard for health and safety. *Id.* ¶ 8. The NARR health and safety standards, which AzRHA certifies its members uphold, have helped keep complaints about any AzRHA certified homes to a minimum. *Id.* ¶ 9. In fact, there have only been 5 complaints against 177 AzRHA sober living homes in the past two years. *Id.* That is because AzRHA sober living homes are family units that blend seamlessly into the neighborhood and community. *Id.* ¶ 10. This blending is performed so well that the public would not be able to spot an AzRHA sober living home unless one was highlighted. *Id.* Consequently, there is no reported complaint that AzRHA sober living homes are associated with blight, community dangers, or unseemly activity. *Id.* ¶ 11. Rather, AzRHA sober living homes abide by prescribed rules, operate peer-run support groups, and conduct routine drug testing. *Id.*

AzRHA sober living homes do not offer substance abuse treatment, counseling, or therapy. *Id.* ¶ 12. Instead, AzRHA sober living homes are nothing more than a group of individuals that voluntarily choose to live together, under the supervision of a house manager, to maintain a sober lifestyle in a safe living environment. *Id.* ¶ 13. The one bond for AzRHA sober living homes is that its residents all happen to be classified by the same federal disability and handicap. *Id.* And it is because of this disability and handicap that AzRHA sober living home members are being discriminated. *Id.* ¶¶ 13 & 15.

## Discriminatory Animus and the Sober Living Homes Statute

The Sober Living Homes statute in A.R.S. § 36-2061 *et seq.* was passed by the Arizona Legislature in 2018 via S.B. 1465 and became effective on August 3, 2018. *See* Ardavin Decl. ¶ 16; *see also* S.B. 1465 (2nd Reg. Sess. 2018), *available at* https://www.azleg.gov/legtext/53leg/2R/laws/0194.pdf. However, the genesis for this legislation began years earlier. Ardavin Decl. ¶ 16. The statute was designed not to benefit the providers of housing for recovering alcoholics and substance abusers, or the recovering persons themselves, but rather with discriminatory intent was designed to protect uncomfortable neighbors from the presence of recovering persons. *Id.* ¶ 17.

The narrative of stereotyping and discriminating against these handicapped and disabled persons, who are disabled by virtue of their alcohol and chemical dependency and choose to participate in sober living homes provided by AzRHA members, began as early as 2015 and has severely harmed the industry and has drove those needing help to less reliable living options that evade regulation altogether. *Id.* ¶ 18. State Representative Noel W. Campbell, an initial sponsor of predecessor legislation, called the sober living homes "halfway houses for people" who were former prison inmates based on his experience in Prescott. *Id.* ¶ 19. In January 2015 and March 2016, on why legislation was allegedly needed for such homes, Representative Campbell stated: "These drug users are considered a protected class under federal law . . . Young men in the neighboring group home hang out smoking in the alley and create fire danger . . . Trash cans at the group home are overloaded so ravens pull out the trash and leave it scattered about . . . These are drug abusers . . . [and] a clash of cultures with the residents." *Id.* ¶ 20.

By 2017, similar animus had spread to parts of the Phoenix metropolitan area. *Id.* ¶ 21. For example, a flyer posted by "Take Action Phoenix" ("TAP") near 3440 E. Shangri La Road on June 12, 2017, warned residents that "Advanced Sober Living purchased the home in our neighborhood . . . to be used as a Halfway House for recovering drug/alcohol addicts" and attempted to rally "each neighbor that is opposed to having a drug and alcohol recovery business in the middle of our neighborhood." *Id.* TAP's current website,

www.takeactionphoenix.com, mischaracterizes sober living homes as filled with residents "[l]oitering, trespassing, or congregating in unauthorized areas," creating "[n]oise that is disrupting," and generating "[p]roperty maintenance issues, including trash, garbage, weeds or lack of yard maintenance." *Id.* ¶ 22. The website implores residents to "[c]ontact the City of Phoenix to tell them about a home you think may be a group home or sober living home" based on the home's mere existence. *Id.* And in 2018, Representative Campbell stated a unique "good neighbor" policy was needed for sober living homes to address the concerns and complaints of nearby neighboring residents. *Id.* ¶ 23. These are some of the stereotypes that led to the Sober Living Home statute. *Id.* ¶ 24. These are the stereotypes that hurt the industry. *Id.*

Ostensibly the Sober Living Homes statute seeks to license and regulate sober living homes "to ensure the public health, safety, and welfare" of Arizona citizens. *Id.* ¶ 25. But, the Sober Living Homes statute imposes unduly burdensome licensing requirements on sober living homes and their residents in violation of the Fair Housing Act, the Americans with Disabilities Act, and the Rehabilitation Act. *Id.* ¶ 26.

Sober living homes were singled out and required by statute to adopt "good neighbor" policies that allegedly protect the surrounding neighborhood from recovering alcoholics and substance abusers. *Id.* ¶ 27. For example, under A.R.S. § 36-2062(A), they were required to (1) have policies and procedures that promote the safety of the surrounding neighborhood and community at large, (2) have policies and procedures for discharge of persons living in the residence so the surrounding community was not negatively impacted, and (3) have policies and procedures for managing complaints about sober living homes. *Id.* Under state law, no other similarly-situated disability group licensed by DHS is required to adopt such "good neighbor" policies. *Id.* When the "good neighbor" policies are viewed in light of legislative and community comments, it becomes clear that the policies were enacted not to benefit a protected disabled group of people, but to punish them. *Id.* ¶ 28. These rules are akin to a neighborhood notification requirement based on disability.

AzRHA held out hope that the impact of the Sober Living Homes statute and rules

would be minimal because DHS delegated AzRHA authority to inspect and certify its own members without the involvement of DHS. *Id.* ¶ 29. And without any need to inspect AzRHA sober living homes, DHS would have no justification to impose licensing fees to pay for inspections at AzRHA homes. *Id.* Regrettably, that did not happen. *Id.* ¶ 30.

### **The Sober Living Homes Rules**

DHS has the authority to establish a fee structure for licensure, license renewal, and late payments under A.R.S. § 36-2064(A). Pursuant to that authority, DHS promulgated the Sober Living Homes rules in A.A.C. R9-12-101 *et seq.* (despite AzRHA's objection) and those rules became effective on July 1, 2019. *Id.* ¶ 31. Unfortunately, the rule-making process that created those rules had the same discriminatory animus that undergirded the original statute. Ardavin Decl. ¶ 30. For instance, in the Economic Impact Statement ("EIS") that DHS submitted to the Governor's Regulatory Review Council ("GRRC"), DHS stated: "The Department believes that requirements in the new rules, as well as the Department's oversight of sober living homes as part of the licensing process, may decrease instances in which the existence of a sober living home in a neighborhood has a negative impact on the residents of the neighborhood, including homeowners. Therefore, the new rules may provide a significant benefit to a homeowner or other resident of a neighborhood in which a sober living home is located." *Id.* However, none of the rules were for the health, welfare, or benefit of residents in sober living homes. *Id.* Rather the rules—and more specifically, the fee structure—were designed to harm and ruin the sober living home mission. *Id.* ¶ 32.

In other words, pursuant to A.A.C. R9-12-103(A)(6) and R-9-12-104(A)(3), each sober living home was required to pay an annual license fee of $500.00, plus $100.00 times the maximum number of beds. *Id.* This fee structure is the highest for any facility licensed by DHS. *Id.* In fact, the fees are almost double those required for assisted living homes, assisted living centers, nursing care institutions, and intermediate care facilities for individuals with intellectual disabilities. *Id.*

For example, under A.A.C. R9-10-106(C)(1)(b), an adult day health care facility,

- 6 -

assisted living home, or assisted living center that has a capacity of one to fifty-nine beds must only pay an annual license fee of $280.00, plus the licensed capacity times $70.00. *Id.* ¶ 33. Under A.A.C. R9-10-106(C)(2)(b), a behavioral health facility that has a capacity of one to fifty-nine beds must only pay an annual license fee of $375.00, plus the licensed capacity times $94.00. *Id.* ¶ 34. Under A.A.C. R9-10-106(C)(4), a nursing care institution or an intermediate care facility for individuals with intellectual disabilities that has a capacity of one to fifty-nine beds must only pay an annual license fee of $290.00, plus the license capacity times $73.00. *Id.* ¶ 35. And under A.A.C. R9-10-106(C)(5), a hospital, home health agency, hospice inpatient facility, abortion clinic, recovery center, outpatient surgical center, pain management clinic, or unclassified health care institution that has a capacity of one to fifty-nine beds must only pay an annual license fee of $365.00, plus the licensed capacity times $91.00. *Id.* ¶ 36.

All these facilities have lower fee requirements than sober living homes and all these facilities can offset their minimal fees by patient insurance payments. *Id.* ¶¶ 37–38. AzRHA sober living homes are not insurance eligible. *Id.* ¶ 39. Therefore, they must bear the brunt of any state licensing fees. *Id.* Moreover, many sober living homes are unable to pass on the cost of licensing fees to their residents due to economic fragility and low economic margins. *Id.* In other words, the Sober Living Homes statute and rules are punishing the good guys, who are not making a huge profit but rather are trying to do good for the community. Unlike an assisted living facility, or a behavioral health facility, or a nursing care institution, sober living homes do not provide any health care services, medical services, and psychological services; nor do they have licensed professional health care workers that provide professional monitoring and supervising for the residents. *Id.* ¶ 40. Thus, it makes no sense why DHS is imposing such fees and unnecessary regulation when DHS has already certified AzRHA to do the same job, but for much less. *Id.*

On December 11, 2018, Senator Kate Brophy McGee, who has many TAP constituents, sent DHS a letter clarifying it was "my intent not to over-regulate good actors in the industry" and to "use the National Association of Recovery and Residences (NARR)

and/its state affiliate the Arizona Recovery Housing Association (AZRHA) . . . as resources for developing ADHS' standards." *Id.* ¶ 42. She noted the requirement of not "putting good homes out of business" and "avoiding unnecessary and overly burdensome regulations." *Id.* But DHS ignored the Senator's plea and subjected AzRHA homes to the exact burdensome licensing fees that Senator Brophy McGee wanted avoided. *Id.* ¶¶ 42–43.

**DHS' Aggressive Enforcement and Refusal to Grant Reasonable Accommodation**

DHS has remained indifferent to AzRHA's concerns and, in fact, has begun to aggressively issue threatening cease and desist letters to AzRHA sober living homes. Ardavin Decl. ¶ 43. On or about September 30, 2019, various AzRHA members submitted their licensing applications to DHS with a reasonable accommodation request for a waiver of the per home and per bed fee. *Id.* ¶ 44. The AzRHA members cited adverse economic impact caused by the fee. *Id.* DHS is required by federal law to make such reasonable accommodations. However, rather than respond to the AzRHA members' requests, DHS sent each AzRHA member a notice of deficiency stating the application was incomplete because the required fee was not included. *Id.* ¶ 45.

On December 16, 2019, AzRHA sent DHS a letter concerning DHS' failure to respond to its members' reasonable accommodation requests. *Id.* ¶ 46. The December 16, 2019 letter advised DHS that a failure to respond was the same as denying it. *Id.* The letter also requested an extension of the deadline to submit a completed application. *Id.*

On December 23, 2019, DHS sent letters to all the AzRHA members that requested a reasonable accommodation and a waiver of the licensing fees. *Id.* ¶ 47. In that letter, DHS stated that providing such accommodation "would, at the very least, impose a substantial, undue financial burden on the Department" and "[l]icensing fees are instrumental to enable the Department to meet its statutory mandate of administering the licensure and regulation of the program." *Id.* DHS stated further that a waiver of fees would result in an undue burden on DHS and would limit, if not eliminate, the department's ability to meet its statutory obligations. *Id.* DHS then denied AzRHA's request for a deadline extension for its members and concluded by stating the applications must be complete by February 1, 2020. *Id.*

On February 27, 2020, AzRHA wrote again to DHS on behalf of its members asking for a reconsideration of the reasonable accommodation waiver denial. *Id.* ¶ 48. AzRHA also requested an explanation as to why DHS created such a disparity in licensure fees for sober living homes compared to assisted living facilities, adult day care facilities, and other housing facilities for persons with disabilities. *Id.* DHS never responded to AzRHA's February 27, 2020 letter, resulting in a constructive final denial. *Id.* ¶ 49.

On or about March 9, 2020, DHS threatened the AzRHA sober living homes that managed to stay open with fines of $1,000.00 per day with a retroactive date of October 2019 if the members did not pay the fees by March 18, 2020. *Id.* ¶ 50. On or about March 18, 2020, AzRHA again sent DHS a letter asking for a waiver due to economic hardship. But once more, DHS ignored (and therefore denied) the request. *Id.* ¶ 51.

In March 2020, AzRHA filed a discrimination complaint with the U.S. Department of Housing and Urban Development ("HUD Complaint") against DHS on behalf of it and its members. *Id.* ¶ 52. The HUD Complaint alleged that the Sober Living Homes statute and its enforcement discriminated against a protected class of persons. *Id.* ¶ 53. In addition, the HUD Complaint alleged that the licensing fee was discriminatory, and that DHS refused to waive or modify the fees imposed as a reasonable accommodation. *Id.* The HUD Complaint was served on the Arizona Attorney General's Office on or about March 23, 2020. *Id.* ¶ 54.

AzRHA's HUD Complaint based on DHS' discriminatory housing practices constitutes a protected activity pursuant to 42 U.S.C. § 3617. Since AzRHA filed the HUD Complaint, DHS continued to intimidate and threaten AzRHA members with $1,000.00 daily fines if the full licensing fee was not paid. *Id.* at ¶ 55. And DHS has followed through with those threats. On or about April 30, 2020, Carla Vista Sober Living, LLC, an AzRHA member, was served with an administrative complaint by DHS. *Id.* ¶ 56. In that administrative complaint, DHS sought $77,000.00 in fines. *Id.* On or about May 4, 2020, Spero House, also an AzRHA member, was served with an administrative complaint by DHS. *Id.* ¶ 57. DHS sought $78,000.00 in fines in that administrative complaint. *Id*. As of the date of this motion, at least six AzRHA sober living home members have been forced

to close: (a) Mesa Rose House for Women—14 beds, (b) Phoenix Freedom for Life Home for Women—10 beds, (c) Phoenix Camelback Recovery-App House for Men—7 beds, (d) Cottonwood Steps to Recovery-Gratitude House for Women—9 beds, (e) Sanctuary I – 7th Place House for Men—7 beds, and (f) Sanctuary II – Becker House for Men—9 beds. *Id.* ¶ 15.

## **ARGUMENT**

A preliminary injunction preserves the status quo and the parties' rights until a final judgment on the merits, *see U.S. Philips Corp. v. KBC Bank N.V.*, 590 F.3d 1091, 1094 (9th Cir. 2010), while a temporary restraining order preserves the status quo until a preliminary injunction hearing is held. *See Granny Goose Foods, Inc. v. Brotherhood of Teamsters & Auto Truck Drivers*, 415 U.S. 423, 439 (1974). The legal standards for both are "substantially identical." *Washington v. Trump*, 847 F.3d 1151, 1159 n.3 (9th Cir. 2017). A plaintiff is entitled to a preliminary injunction when it establishes that it is: "[1.] likely to succeed on the merits, [2.] likely to suffer irreparable harm in the absence of preliminary relief, [3.] the balance of equities tips in [its] favor, and [4.] an injunction is in the public interest." *Winter v. Nat'l Res. Defense Coun.*, 555 U.S. 7, 20 (2008). "But if a plaintiff can only show that there are 'serious questions going to the merits'—a lesser showing than likelihood of success on the merits—then a preliminary injunction may still issue if the 'balance of hardships tips sharply in plaintiff's favor,' and the other two *Winter* factors are satisfied. *Shell Offshore, Inc. v. Greenpeace, Inc.*, 709 F.3d 1281, 1291 (9th Cir. 2013).

I.  **AzRHA is likely to succeed on the merits.**

AzRHA alleged three causes of action in its First Amended Complaint: (1) violation of the Fair Housing Act, (2) violation of the Americans with Disabilities Act, and (3) violation of the Federal Rehabilitation Act. Each cause of action entails both facial and as-applied discrimination. As a result, AzRHA is likely to succeed on the merits of its claims.

    **A.**    **The Sober Living Homes statute and rules violate the federal Fair Housing Act and its accompanying regulations.**

Congress amended the Fair Housing Act (42 U.S.C. § 3601 *et seq.*) in 1988 to extend

the guarantee of fair housing to handicapped persons. And the Supreme Court has mandated broad and liberal construction of the Fair Housing Act to effectuate this goal. *Trafficante v. Metropolitan Life Ins. Co.*, 409 U.S. 205, 211-212 (1972).

Under the Fair Housing Act, "handicap" means a person with a "physical or mental impairment which substantially limits one or more of such person's major life activities." 24 C.F.R. § 100.201. The term "physical or mental impairment" includes "alcoholism" and "drug addiction (other than addiction caused by current, illegal use of a controlled substance)." *Id.*

To guarantee fair housing to handicapped persons, the Fair Housing Act sets forth several prohibitions. First, it is unlawful to discriminate against a handicapped person or deny them a dwelling based either on their handicap or the handicap of someone associated with them. 42 U.S.C. § 3604(f)(1). Second, it unlawful to discriminate against a person with a handicap based on any dwelling's terms, conditions, or privileges. 42 U.S.C. § 3604(f)(2)(C). In this context, discrimination includes refusing "to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford [a handicapped] person equal opportunity to use and enjoy a dwelling." 42 U.S.C. § 3604(f)(3)(B). Third, it is unlawful to intimidate, threaten, or interfere with a handicap person's enjoyment of a dwelling. 42 U.S.C. § 3617. Fourth and finally, it is unlawful to make, print, publish, or cause "to be made, printed, or published" housing statements that "indicate a limitation, preference, or discrimination on the basis of disability." 42 U.S.C. § 3604(C). If a state law or rule were to permit any one of these prohibited acts, the Fair Housing Act requires that state law or rule be invalidated. 42 U.S.C. § 3615.

Such discrimination may be on the face of the offending law or rule or become apparent as applied to particular circumstances. Facial discrimination, such as disparate treatment, means a policy's plain language treats a protected group differently from others. *Cmty. House, Inc. v. City of Boise*, 490 F.3d 1041, 1048–49 (9th Cir. 2007). For instance, a men-only community housing policy is facially discriminatory because the policy explicitly

treats women and families different from men. *Id.* Likewise, a workplace policy prohibiting women with the capacity to bear children from performing certain jobs is facially discriminatory. *See Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am. v. Johnson Controls, Inc.*, 499 U.S. 187, 197 (1991). And the same is true when state statutes and local ordinances treat recovering alcoholics and substance abusers differently from non-handicapped persons by precluding them from living in certain neighborhoods or imposing discriminatory terms that apply only the handicapped. *See Jeffrey O. v. City of Boca Raton*, 511 F. Supp.2d 1339, 1350 & 1355 (S.D. Fla. 2007); *see also Bangerter v. Orem City Corp*, 46 F.3d 1491, 1500 (10th Cir. 1995); *Nev. Fair Hous. Ctr., Inc. v. Clark Cty.*, 565 F. Supp. 2d 1178, 1182 (D. Nev. 2008); *Potomac Group Home Corp. v. Montgomery County*, 823 F. Supp. 1285, 1297 (D. Md. 1993) (neighborhood notification requirement violated that Fair Housing Act).

Disparate impact provides a remedy in two situations that disparate treatment may not reach. First, "it permits plaintiffs to counteract unconscious prejudices and disguised animus that escape easy classification[.]" *Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project, Inc.*, 135 S. Ct. 2507, 2511-12 (2015); *see also Huntington Branch, N.A.A.C.P. v. Huntington*, 844 F.2d 926, 935 (2d Cir. 1988) (noting that "clever men may easily conceal their motivations" and that disparate-impact analysis is needed because "[o]ften, such [facially neutral] rules bear no relation to discrimination upon passage, but develop into powerful discriminatory mechanisms when applied"). Second, disparate impact not only serves to uncover unconscious or consciously hidden biases, but also targets "artificial, arbitrary, and unnecessary barriers" to minority housing and integration that can occur through unthinking, even if not malignant, policies of developers and governmental entities. *Tex. Dep't of Hous*, 135 S. Ct. at 2522. In this way, disparate impact "recognize[s] that the arbitrary quality of thoughtlessness can be as disastrous and unfair to private rights and the public interest as the perversity of a willful scheme." *United States v. City of Black Jack, Mo.*, 508 F.2d 1179, 1185 (8th Cir. 1974); *Ave. 6E Invs., Ltd. Liab. Co. v. City of Yuma*, 818 F.3d 493, 503 (9th Cir. 2016).

Finally, DHS denied AzRHA's multiple reasonable accommodation requests, either directly or by failing to respond. The reasons proffered by the wholesale rejection of the individual AzRHA members' accommodation requests fail because DHS failed to conduct a case-by-case inquiry on each individual request as required by the FHA, ADA and the Rehabilitation Act. *City of Edmonds v. Wash. State Bldg. Code Council*, 18 F.3d 802, 806 (9th Cir. 1994). For instance in *United States v. Cal. Mobile Home Park Mgmt. Co.*, 29 F.3d 1413, 1418 (9th Cir. 1994), the Court reversed the dismissal of the complaint on a fee waiver accommodation request. It held that "a reviewing court should examine, among other things, the amount of fees imposed, the relationship between the amount of fees and the overall housing cost, the proportion of other tenants paying such fees, the importance of the fees to the landlord's overall revenues, and the importance of the fee waiver to the handicapped tenant."

The Sober Living Homes statute and rules must be invalidated (and DHS and Director Christ's enforcement must be enjoined) because AzRHA is able to prevail on its facial (disparate treatment) and as-applied (disparate impact and failure reasonable accommodate) claims. First, the statute and rules treat AzRHA, its members, and residents in a discriminatory manner by compelling "good neighbor" policies when no other similarly situated disabled group has to do likewise. This intent is buttressed through statements by Representative Campbell, community organizations that advocated for the legislation, and DHS and Director Christ via their EIS. Second, the statute and rules have a discriminatory effect on AzRHA, its members, and residents by the imposition of onerous licensing fees that are almost double of any other similarly situated disabled group home. The licensing fees have an additional and particularly acute impact, as applied to AzRHA and its members, because AzRHA sober living homes are compelled to pay for DHS inspections despite being exempt from such inspections.

Third, even if the Sober Living Homes statute and rules were neutral (which they are not), DHS and Director Christ refused to consider and therefore denied AzRHA's reasonable accommodation request to the burdensome licensing fees.

For these reasons, AzRHA is likely to succeed on the merits of its Fair Housing Act claim.

**B.    The Sober Living Homes statute and rules violate the Americans with Disabilities Act, Federal Rehabilitation Act and accompanying regulations.**

The standards of proof required for FHA, ADA, and Rehabilitation Act disparate treatment claims are identical, and are all drawn largely from Title VII cases. *See Budnick*, 518 F.3d at 1114 (Title VII standards apply to FHA claims); *Pac. Shores Props., Ltd. Liab. Co. v. City of Newport Beach*, 730 F.3d 1142, 1158 n.19 (9th Cir. 2013); (same); *Hernandez*, 362 F.3d at 568 (Title VII standards apply to ADA claims); *Bay Area Addiction Research & Treatment, Inc. v. City of Antioch*, 179 F.3d 725, 731-32 (9th Cir. 1999) (ADA and Rehabilitation Act claims are treated the same). Thus, for the same reasons outlined above, AzRHA is likely to succeed on its ADA and Rehabilitation Act claims as well.

## II.    AzRHA will suffer further irreparable harm unless Defendants are enjoined.

When defendants violate a civil right statute like the Fair Housing Act, the ADA, or the Federal Rehabilitation Act, irreparable harm is presumed. *See Silver Sage Partners, LTD v. City of Desert Hot Springs*, 251 F.3d 814, 827 (9th Cir. 2001); *see also Groome Resources, Ltd. v. Parish of Jefferson*, 234 F.3d 192, 200 (5th Cir. 2000) (housing discrimination causes a uniquely immediate injury); *Gresham v. Windrush Partners, Ltd.*, 730 F.2d 1417, 1423 (11th Cir. 1984) ("irreparable injury may be presumed from the fact of discrimination and violations of fair housing statutes").

AzRHA will be irreparably harmed if the Court does not enter a temporary restraining order in its favor. The Sober Living Homes statute and rules are facially discriminatory because they target a protected class of disabled persons and treat them differently. One aspect of the discriminatory policy is the excessive licensing fee it imposes just for providing housing (and nothing more) to a protected class. A facially discriminatory policy is one which on its face applies less favorably to a protected group. *See Frank v. United Airlines, Inc.*, 216 F.3d 845, 854 (9th Cir. 2000); *see also Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am. v. Johnson Controls, Inc.*, 499 U.S. 187,

- 14 -

197 (1991); *Bangerter,* 46 F.3d at 1500 (holding that an ordinance that singled out the handicapped and applied different rules to them was facially discriminatory); *Cmty. House, Inc. v. City of Boise*, 468 F.3d 1118, 1123-24 (9th Cir. 2006) (The men-only policy at Community House is facially discriminatory because it explicitly treats women and families different from men).

Unlike the classifications found to be facially discriminatory in the cases cited above, the State of Arizona did not resort to euphemisms in the Sober Living Homes statute and rules. Among the definitions contained in the implementing regulations are: "Facility," which "means the building or buildings used for operating a sober living home;" "Resident," which "means an individual who is accepted by a licensee under the terms of a residency agreement with the individual to live at the licensee's sober living home;" and "Sober" or "sobriety," which means that an individual is free of alcohol or drugs, except for a drug that is [. . .] [u]sed as part of medication-assisted treatment, [. . .] [t]he individual's prescription medication, or [. . .] [a]n over-the-counter drug. A.A.C. § R9-12-101.

The Sober Living Homes statute and rules clearly target a federally protected group (recovering alcoholics and substance abusers). Consequently, by themselves, these facts are enough to demonstrate irreparable harm. Nonetheless, that irreparable harm becomes even greater when the discriminatory effect of the onerous licensing fees is considered. At least six AzRHA sober living homes have been forced to close because of the fees and countless more are expected to follow because of DHS' zealous enforcement and excessive fines. Thus, AzRHA has suffered and will continue to suffer irreparable harm unless Defendants are enjoined.

**III.    The balance of equities weighs in favor of granting injunctive relief.**

When determining the balance of equities, courts "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24. The irreparable harm that AzRHA will suffer without temporary and preliminary relief decidedly outweighs any harm defendants may suffer if the injunction is denied. The injunctive relief sought here merely preserves

the status quo and permits AzRHA sober living homes to continue to operate and serve. It does not require the expenditure of any financial resources by DHS. Thus, AzRHA's requested injunction is prohibitory and requires nothing of DHS. DHS "cannot suffer harm from an injunction that merely ends an unlawful practice or reads a statute as required to avoid constitutional concerns." *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013); *see also Diamond House of SE Idaho, LLC v. City of Ammon*, 381 F. Supp. 3d 1262, 1279 (D. Idaho 2019). Consequently, the balance of equities weighs in AzRHA's favor.

## IV. The public interest is served by granting injunctive relief.

In the Federal Fair Housing Act, Congress declared "it is the policy of the United States to provide, within constitutional limitations, for fair housing throughout the United States." 42 U.S.C. § 3601. Accordingly, courts have emphatically declared the public interest is served by effective enforcement of the Act. *See e.g., S. California Hous. Rights Ctr. v. Krug,* 564 F. Supp. 2d 1138, 1145 (C.D. Cal. 2007) (noting that when granting injunctive relief where a Federal Fair Housing Act violation has occurred, "the public interest in abolishing discrimination dictates that the defendants be held to a continuing standard of fair dealing"); *Gonzalez v. Recht Family P'ship*, 51 F. Supp. 3d 989, 992-93 (S.D. Cal. 2014) (plaintiff met the public interest requirement for preliminary injunction where she established discrimination on the basis of disability because the "public interest has been authoritatively declared by Congress" in its enactment of the Fair Housing Act); *see also United States v. Puerto Rico, 764 F. Supp.* 220, 225 (D. Puerto Rico 1991) (emphasizing "the public interest that all citizens have in seeing vigorous enforcement of civil rights legislation like the Fair Housing Act" in concluding that "the public interest weighs heavily in favor of a preliminary injunction"). The same is true for the ADA and the Rehabilitation Act. *See Tamara v. El Camino Hosp.*, 964 F. Supp.2d 1077, 1088 (N.D. Cal. 2013) ("the public has a strong interest in promoting the equality of all persons") ; *see also* H. Rept. 100-711 at 18 (expressing Congress's desire to "end the unnecessary exclusion of persons with handicaps from the American mainstream"). Thus, the public interest also favors AzRHA and the protection of federally handicapped and disabled persons.

Accordingly, since AzRHA is able to satisfy all four temporary restraining order and preliminary injunction elements, injunctive relief is proper here until the Court has an opportunity to hear the case on its merits.

## **CONCLUSION**

The Sober Living Homes statute, rules, and their enforcement have closed at least six AzRHA sober living homes and countless more will likely follow unless injunctive relief is granted. Because no other relief can adequately compensate it, AzRHA moves the Court to grant its Motion for a Temporary Restraining Order and Preliminary Injunction.

Dated this 13th day of May 2020.

SNELL & WILMER L.L.P.

By: s/ *Eric H. Spencer*
Eric H. Spencer
Ryan J. Regula
Heather Dukes
One Arizona Center
400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
*Attorneys for Arizona Recovery Housing Association*

THE LAW OFFICE OF STEVEN G. POLIN

By: s/ *Steven G. Polin* (with permission)
Steven G. Polin
3034 Tennyson Street, NW
Washington, DC 20015
*Attorneys for Arizona Recovery Housing Association*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 13th day of May, 2020, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to all CM/ECF Registrants.

                                                   s/ *Nicole Begazo*