**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Arizona Recovery Housing Association,<br><br>                Plaintiff,<br><br>v.<br><br>Arizona Department of Health Services, et al.,<br><br>                Defendants. | No. CV-20-00893-PHX-JAT<br><br>**ORDER** |

Pending before the Court is Plaintiff Arizona Recovery Housing Association's ("Plaintiff") Motion for a Temporary Restraining Order ("TRO"). (Doc. 11). Defendants Arizona Department of Health Services ("DHS") and Director Cara Christ ("the Director"; collectively, "Defendants") have responded, (Doc. 16), and Plaintiff has replied, (Doc. 18). The Court now rules on the motion.

**I.  BACKGROUND**

In 2018, the Arizona Legislature passed a series of statutes regulating the operation of "sober living homes" in the state. (Doc. 11 at 5). Under that legislation, a sober living home refers to

> any premises, place or building that provides alcohol-free or drug-free housing and that:
>
> (a) Promotes independent living and life skills development.
> (b) May provide activities that are directed primarily toward recovery from substance use disorders.
> (c) Provides a supervised setting to a group of unrelated individuals

who are recovering from substance use disorders.
(d) Does not provide any medical or clinical services or medication administration on-site, except for verification of abstinence.

A.R.S. § 36-2061(3). Before the enactment of this legislation, such homes could operate with a certification from an organization, like Plaintiff's, that inspects and certifies the homes meet national standards for health and safety. (Docs. 11 at 4; 16 at 17). Now, however, a certification is inadequate—all sober living homes must obtain a license from DHS to operate in the state. A.R.S. §§ 36-2062(E), -2064(A).

In addition to instructing DHS to "adopt rules to establish minimum standards and requirements for the licensure of sober living homes in this state necessary to ensure the public health, safety and welfare," the statute also establishes baseline requirements that those standards "shall include." A.R.S. § 30-2062(A). These requirements are:

> 1. A requirement that each sober living home to develop policies and procedures to allow individuals who are on medication-assisted treatment to continue to receive this treatment while living in the sober living home.
> 2. Consistent and fair practices for drug and alcohol testing, including frequency, that promote the residents' recovery.
> 3. Policies and procedures for the residence to maintain an environment that promotes the safety of the surrounding neighborhood and the community at large.
> 4. Policies and procedures for discharge planning of persons living in the residence that do not negatively impact the surrounding community.
> 5. A good neighbor policy to address neighborhood concerns and complaints.
> 6. A requirement that the operator of each sober living home have available for emergency personnel an up-to-date list of current medications and medical conditions of each person living in the home.
> 7. A policy that ensures residents are informed of all sober living home rules, residency requirements and resident agreements.
> 8. Policies and procedures for the management of all monies received and spent by the sober living home in accordance with standard accounting practices, including monies received from residents of the sober living home.
> 9. A requirement that each sober living home post a statement of resident rights that includes the right to file a complaint about the residence or provider and information about how to file a complaint.
> 10. Policies that promote recovery by requiring residents to participate in treatment, self-help groups or other recovery supports.

      11. Policies requiring abstinence from alcohol and illicit drugs.
      12. Procedures regarding the appropriate use and security of medication by a resident.

A.R.S. § 30-2062(A)(1)–(12). DHS must also set the fees that prospective licensees must pay for the initial license, subsequent renewals, and as a penalty for tardy payment. A.R.S. § 36-2063(A). Ninety percent of the fees go to the state's "health services licensing fund," with the remainder deposited in the state's general fund. *Id.*; *see also* A.R.S. § 36-414.

      To give teeth to these requirements, the statutory scheme empowers DHS to investigate sober living homes to determine if they are adhering to licensing requirements and impose civil sanctions for noncompliance. *See* A.R.S. § 36-2063(B) (authorizing the Director to investigate, on reasonable cause and at a reasonable time, compliance with statutory and regulatory requirements). "A person operating a sober living home in this state that has failed to attain or maintain licensure of the sober living home shall pay a civil penalty of up to one thousand dollars for each violation." A.R.S. § 36-2062(B). If DHS determines a home is operating in violation of statutory and regulatory requirements, it may impose an additional penalty assessment of "not more than five hundred dollars for each violation," with "[e]ach day that a violation occurs constitut[ing] a separate violation." A.R.S. § 36-2063(C). Any person fined under this section may request a hearing, however, and DHS cannot take any further act to collect the assessment until the hearing process is complete. *Id.*

      DHS exercised its authority to promulgate rules establishing the "fee structure for licensure, license renewal, and late payments." (Doc. 11 at 7). Those rules impose "[a] licensing fee of $500 plus $100 times the maximum number of residents of the proposed sober living home" for both the initial license and subsequent renewal. A.A.C R9-12-103(A)(6), -104(A)(3). In addition, the rules call for a $250 late fee if a licensee fails to timely renew the license. A.A.C. R9-12-104(B).

      Plaintiff maintains that DHS has overzealously enforced these requirements in a way that harms the homes that Plaintiff has previously certified, largely because the cost

of the licensing fees is apparently too much to bear. (Doc. 11 at 9). For example, it claims that DHS responded to various homes' "reasonable accommodation request[s] for a waiver of the per home and per bed fee" by informing those homes that their applications were incomplete for failure to pay the required fee. (*Id.*). In response to a follow-up letter demanding an answer to the reasonable accommodation requests, DHS stated that waiving the fee "would, at the very least, impose a substantial and undue financial burden" because such fees "enable [DHS] to meet its statutory mandate of administering the licensure and regulation of the program." (*Id.*). DHS did not respond to subsequent requests to reconsider whether to waive the licensing fees. (*Id.* at 9–10).

At this stage in the litigation, the precise contours of what happened next remains somewhat unclear. What is clear, however, is that six of the homes Plaintiff had certified elected to close and certain others continued to operate without paying licensing fees. (*Id.* at 10–11). That situation continued until DHS "threatened . . . fines of $1,000 per day with a retroactive date of October 2019 if" those homes did not pay by March 18, 2020. (*Id.* at 10). At April's end and May's beginning, DHS "issued cease and desist orders and notices of civil money penalty assessments" to two of the unlicensed homes Plaintiff has certified: Carla Vista Sober Living and Spero House. (Docs. 11 at 10–11; 16 at 4). It has also issued "letters of deficiency that indicate [its] intent to deny the applications [of two others]—J&J [Sober Living] and Navarro [House]." (Doc. 16 at 4).

Seeking to halt DHS's efforts to collect these fees from the homes it certifies, Plaintiff filed a complaint in this Court on May 7, 2020 alleging that the statutes and rules governing sober living homes violate the Fair Housing Act ("FHA"), the Americans with Disabilities Act ("ADA"), and the Federal Rehabilitation Act ("FRA"). (Doc. 1). Six days later, Plaintiff filed an amended complaint and a motion requesting both a TRO and a preliminary injunction. (Docs. 7 & 8). The Court denied the motion without prejudice, however, because Plaintiff failed to adequately specify the relief it sought from the Court at that time. (Doc. 9 at 2). That same day, Plaintiff re-filed to specify that it sought a TRO only at this stage. (Doc. 11).

## II. DISCUSSION

Although courts employ identical standards to evaluate whether to issue a TRO or a preliminary injunction, the two forms of relief serve different purposes. *Johnson v. Macy*, No. CV 15-7165 FMO (ASx), 2015 WL 9692930, at *3 (C.D. Cal. Oct. 23, 2015). "The purpose of a preliminary injunction is to preserve the status quo and the rights of the parties until a final judgment on the merits can be rendered, while the purpose of a [TRO] is to preserve the status quo before a preliminary injunction hearing may be held." *Id.* (citations omitted).

Such preliminary relief "is an extraordinary remedy never awarded as of right." *Winter v. NRDC, Inc.*, 555 U.S. 7, 24 (2008). A party is entitled to this extraordinary form of relief if it can show "[it] is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that [the TRO] is in the public interest." *Id.* at 20. If the party is not quite able to show a likelihood of success on the merits, but is able to raise at least "serious questions going to the merits" it may still be entitled to preliminary relief provided it can show that "the balance of hardships . . . tips sharply" in its favor, that the TRO will do more good than harm, and is in the public interest. *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011). Under either version of this test, the movant bears the burden to make "a clear showing" that it meets all four elements. *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (emphasis omitted) (quoting 11A Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, *Federal Practice and Procedure* § 2948, pp. 129–130 (2d ed.1995)).

### A. Irreparable Harm

Plaintiff argues the statutes and rules governing sober living homes subject it to likely irreparable harm for two reasons. First, it contends that "[w]hen defendants violate a civil right[s] statute like the [FHA], the ADA, or the [FRA], irreparable harm is presumed." (Doc. 11 at 15). Second, it points to the "discriminatory effect of the onerous licensing fees" and contends that irreparable harm has already occurred, and will continue to occur, because "six . . . sober living homes have been forced to close because of the fees

and countless more are expected to follow because of DHS'[s] zealous enforcement and excessive fines." (*Id.* at 16).

Defendants vigorously dispute the notion that Plaintiff is likely to suffer irreparable harm. (Doc. 16 at 13–15). Specifically, they contend that any presumption of harm cannot apply at this stage of the litigation, that Plaintiff asserts "purely economic" harms, identifies no imminent pending action that will inflict this harm, and that Plaintiff cannot itself be harmed because "[i]t does not operate a sober living home and has not applied for a license to operate a sober living home" meaning DHS "does not have any licensing or regulatory authority over [Plaintiff] and cannot take any enforcement action against Plaintiff." (*Id.* at 2–3, 13–15).[1]

Plaintiffs seeking preliminary relief cannot rely on the mere possibility that irreparable harm will occur but must instead show such harm is "likely in the absence of an injunction." *Winter*, 555 U.S. at 22 (emphasis omitted). To show irreparable harm, a plaintiff must demonstrate that other legal remedies like money damages cannot cure that harm. *See Stanley v. Univ. of S. Cal.,* 13 F.3d 1313, 1320–21 (9th Cir. 1994) (explaining that to obtain a preliminary injunction, the moving party must demonstrate that the remedy at law is inadequate). The mere fact that the damages are susceptible to quantification, however, does not necessarily mean that a preliminary injunction will not lie—being forced to shutter one's business may well be an irreparable harm. *hiQ Labs, Inc. v. LinkedIn Corp.*, 938 F.3d 985, 993 (9th Cir. 2019); *see also Semmes Motors, Inc. v. Ford Motor Co.*, 429 F.2d 1197, 1205 (2d Cir. 1970) ("But the right to continue a business in which William Semmes had engaged for twenty years and into which his son had recently entered is not measurable entirely in monetary terms; the Semmes want to sell automobiles, not to live

---

[1] Defendants discuss the fact that Plaintiff does not operate a sober living home and none of the operators are involved in this litigation but does not cite legal authority or specifically argue that the Court should dismiss for lack of standing. (Doc. 16 at 3–4). Defendants also point to the fact that administrative proceedings have begun. (*Id.* at 6–7). At this point, the Court will not consider these facts as a reason to dismiss the case and will only consider them in its irreparable harm analysis. This determination is, of course, without prejudice to future well-supported arguments that the Court should dismiss for lack of standing or because of the existence of ongoing state administrative proceedings. *See Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69, 79–80 (2013).

on the income from a damages award."). Lastly, given that the purpose of a TRO is to maintain the status quo until a potential hearing on a preliminary injunction, any likely threat of harm must threaten to disrupt that status quo; that is, the threat must be imminent. *See Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988); *see also Park Vill. Apartment Tenants Ass'n v. Mortimer Howard Tr.*, 636 F.3d 1150, 1160 (9th Cir. 2011) ("An injunction will not issue if the person or entity seeking injunctive relief shows a mere 'possibility of some remote future injury,' or a 'conjectural or hypothetical' injury." (citations omitted)).

Under this circuit's "case-specific approach, '[courts] do not presume irreparable harm' simply because a defendant violates a statute that authorizes injunctive relief." *Park Vill. Apartment Tenants Ass'n*, 636 F.3d at 1162 (quoting *Small ex rel. NLRB v. Operative Plasterers' & Cement Masons' Int'l Ass'n Local 200*, 611 F.3d 484, 494 (9th Cir. 2010)). That is not to say, however, that a court can never apply a presumption when ruling on an injunction for "Congress may intervene and guide or control the exercise of the courts' discretion." *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 542 (1987) (quoting *Weinberger v. Romero–Barcelo*, 456 U.S. 305, 313 (1982)). Nevertheless,

> courts cannot lightly assume Congress intended to do away with the irreparable-harm factor in any given case. Rather, courts must carefully analyze the statute at issue "to determine whether Congress intended to make 'a major departure from the long tradition of equity practice' and create a statutory presumption or categorical rule for the issuance of injunctive relief."

*Idaho v. Coeur d'Alene Tribe*, 49 F. Supp. 3d 751, 763 (D. Idaho 2014) (quoting *Perfect 10, Inc. v. Google, Inc.*, 653 F.3d 976, 981 n.2 (9th Cir. 2011)), aff'd, 794 F.3d 1039 (9th Cir. 2015). Thus, employing the usual tools of statutory interpretation, the Court must determine if the statute authorizing the injunction "explicitly, 'or by a necessary and inescapable inference,' restricts a court's discretion to decide whether a plaintiff has suffered irreparable injury." *Cottonwood Envtl. Law Ctr. v. U.S. Forest Serv.*, 789 F.3d 1075, 1090 (9th Cir. 2015) (quoting *Amoco*, 480 U.S. at 542).

The Court need go no further than *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388 (2006), however, to conclude that the plain language of the FHA's injunction-authorizing provision, 42 U.S.C. § 3613(c)(1), does not mandate a presumption of irreparable harm. In holding that nothing in the Patent Act portended congressional intent to depart from traditional equitable principles such that a court must issue a permanent injunction on a finding of infringement, the Supreme Court reasoned that "[l]ike the Patent Act, the Copyright Act provides that courts 'may' grant injunctive relief 'on such terms as it may deem reasonable to prevent or restrain infringement of a copyright." *Id.* at 393 (quoting 17 U.S.C. § 502(a)). Under that permissive language, the Court had "consistently rejected invitations to replace the traditional equitable considerations with a rule that an injunction automatically follows a determination that a copyright has been infringed." *Id.* at 393–94 (collecting cases). Indeed, following *eBay*, the Ninth Circuit Court of Appeals applied its holding to the preliminary injunction context in a proceeding under the Copyright Act and refused to apply a presumption of irreparable harm because such "permissive language does not evince a congressional intent to depart from traditional equitable principles." *Perfect 10*, 653 F.3d at 980.

    The FHA's injunction-authorizing provision uses this same permissive language:

> In a civil action under subsection (a), if the court finds that a discriminatory housing practice has occurred or is about to occur, the court . . . *may grant as relief, as the court deems appropriate*, any permanent or temporary injunction, temporary restraining order, or other order (including an order enjoining the defendant from engaging in such practice or ordering such affirmative action as may be appropriate).

42 U.S.C. § 3613(c)(1) (emphasis added). This permissive language does not indicate Congress intended a major departure from the long tradition of equity practice. The text does not establish a different standard for obtaining injunctive relief that excludes proof of irreparable harm as one of its elements. As *eBay* and *Perfect 10* recognized with regard to the Patent and Copyright Acts, the provision simply says that a court may grant an injunction on a showing that a violation has or is about to occur, a standard that is perfectly

- 8 -

consistent with the traditional test for equitable relief.[2]

Plaintiff relies on none of this authority, let alone any reference to the statute's text, to champion application of the presumption of irreparable harm. Instead, it points to *Silver Sage Partners, Ltd. v. City of Desert Hot Springs*, 251 F.3d 814, 827 (9th Cir. 2001), where the Ninth Circuit Court of Appeals noted it had previously "presume[d] that the plaintiff ha[d] suffered irreparable injury from the fact of the defendant's violation" of a civil rights statute and remanded for reconsideration of the plaintiff's motion for an injunction. But in *Silver Sage Partners* a jury had already found an FHA violation and nothing in the case requires a court to apply a presumption of irreparable harm in the preliminary injunction context. *Id.* Indeed, its specific holding—that a plaintiff need not even establish a reasonable likelihood of an FHA violation—cannot be squared with *Winter*'s instruction that a preliminary injunction cannot issue on the mere possibility of harm. *Anselmo v. Mull*, No. CIV. 2:12-1422 WBS EFB, 2012 WL 5304799, at *7–8 (E.D. Cal. Oct. 25, 2012).

As do many of the district courts that continue to follow the broad language of *Silver Sage Partners*, Plaintiff also points to *Gresham v. Windrush Partners, Ltd.*, 730 F.2d 1417, 1423–24 (11th Cir. 1984) (citations omitted), where the Eleventh Circuit Court of Appeals so ably described the injuries that flow from discriminatory housing deprivations:

> [A] person who is discriminated against in the search for housing cannot remain in limbo while a court resolves the matter. He or she must find elsewhere, and once that housing is found, even in a segregated neighborhood, it becomes difficult to disrupt new friendships and other community ties by uprooting oneself again.
>
> Second, in a case such as this one, the available housing where the discrimination is occurring could become filled during the pendency of a lawsuit, making corrective relief nearly impossible to enter . . . . [Other] harm[s] include[] "the loss of safe, sanitary, decent and integrated housing; the loss of achieving integrated schools without the necessity of massive

---

[2] By way of contrast, a presumption of harm was mandated by a statute that listed the elements required for an enforcing agency to obtain an injunction, without mentioning irreparable harm, and where legislative history indicated "Congress 'intended to codify the decisional law' that 'lightened the agency's burden by eliminating the need to show irreparable harm.'" *F.T.C. v. Consumer Def., LLC*, 926 F.3d 1208, 1213–14 (9th Cir. 2019) (quoting *F.T.C. v. Weyerhauser Co.*, 665 F.2d 1072, 1081 (D.C. Cir. 1981)).

busing; the loss of housing which is accessible to jobs; and the loss of being unable to escape the never-ending and seemingly unbreakable cycle of poverty."

The Court agrees with *Gresham* that all these things are true when someone is denied housing, or faces an imminent and likely threat of denial, simply because he or she is a member of a class that the FHA protects. Where the Court parts ways with *Gresham*, however, is that it does not believe all these harms are automatically present whenever a plaintiff can point to a law that may end up violating the FHA. Any injury at that point may still be theoretical, so far off that it is uncertain whether it will even occur.

As Defendants persuasively demonstrate, any injury is neither imminent nor certain to occur because the administrative process for enforcing the statutes and rules now challenged has only just begun. A sober living home has the right to request a hearing to appeal any civil penalty assessment, and DHS "may not take further action to enforce and collect the assessment until the hearing process is complete." A.R.S. § 36-2063(C). After a sober living home has requested a hearing, DHS, "as soon as practicable, shall hold a hearing, and if the [D]irector determines the order is reasonable and just and that the practice engaged in is contrary to the health laws of this state, the [D]irector shall order the person to comply with the cease and desist order." A.R.S. § 36-601(B). Under the statute, then, when DHS serves a cease and desist order, that action merely triggers the beginning of a process that allows the party to make their case as to why it should not be fined, a process that culminates in the Director exercising her discretion to determine if a fine would be "reasonable and just." Likewise, when DHS denies a sober living home license, the prospective licensee has appeal rights. A.A.C. R9-12-107(C). And, generally, after a final decision on an administrative appeal, a party may further appeal that administrative decision in Arizona's state courts under the Arizona Administrative Procedures Act. A.R.S. § 41-1092.08(H). A reviewing court may not affirm an administrative action that is "contrary to law," including the FHA. A.R.S. § 12-910(E). Thus, even on the initial denial of a license application, any final decision—and any action to collect civil penalties as a

result—is not imminent and certainly will not occur before the Court can hold a preliminary injunction hearing.

To the extent that Plaintiff provides that the sober living homes it has certified are facing any action under the statutes and rules it challenges, those actions are currently at only just the beginning of this administrative process. Carla Vista House and Spero House, who face cease and desist orders for operating sober living homes without a license, have requested administrative hearings to challenge those orders. (Doc. 16 at 6). J&J Sober Living, who did not obtain approval of its license application, has likewise requested an appeal of that decision. (*Id.*). While Navarro House—who also did not obtain a license— has not appealed, its deadline to do so has not yet run. (*Id.*).

Plaintiff also points to the fact that six sober living homes have closed since the state passed the sober living homes licensing statutes. (Doc. 11 at 11). But what is missing from this rather cursory allegation is any meaningful explanation about *why* those homes closed. In other words, the Court cannot determine whether those six homes closed because they elected not to pay the licensing fee, whether they were subject to any fines for noncompliance with the statutes, or whether they closed for any other reason. While an immediate threat of being forced out of business may suffice to show irreparable harm, it does not inexorably follow that because some businesses have closed for any number of reasons that other businesses will close too. And as discussed above, at least some of the sober living homes are still fighting these fines in state administrative proceedings. A finding of likely irreparable harm cannot be based on so thin a reed.

Two other factors weigh against a finding of irreparable harm here. While Defendant somewhat misrepresents Plaintiff's identification of harm as merely financial, it cannot be denied that the thrust of Plaintiff's request concerns its objection to the licensing fees, which could be compensated by money damages. Finally, it cannot be denied that none of these harms—whether financial or otherwise—will be inflicted on Plaintiff because Plaintiff is not a sober living home.

Absent a contrary command from Congress, this Court must adhere to the traditional

four-prong test for injunctions as articulated in *Winter* and *Cottrell*. The Court cannot apply a presumption of irreparable harm and still comply with *Winter*'s instruction that an injunction cannot issue on the mere possibility of harm. 555 U.S. at 22. Surely, applying a presumption of harm would sweep in some cases where any harm is no more than a mere possibility. Absent that presumption, Plaintiff fails to establish that any of the business-related harms it relies on are sufficiently imminent to warrant issuing a TRO.

### B. Merits

Having concluded that Plaintiff fails to show sufficiently imminent and irreparable harm to justify a TRO, the Court could stop there and simply deny the motion. The Court will say a brief word about the merits, however, in an effort to ensure that the briefing on any potential motion for a preliminary injunction focuses on the relevant issues.

To establish an FHA discrimination claim, a plaintiff can rely on one of three theories: (1) disparate treatment, (2) disparate impact, (3) failure to make reasonable accommodations for handicapped housing. *Gamble v. City of Escondido*, 104 F.3d 300, 304–05 (9th Cir. 1997). There are two kinds of disparate treatment cases. The first, encompasses claims where a private person or governmental entity refuses "to sell or rent housing to someone because of . . . [a] protected characteristic." *Ave. 6E Invs., LLC v. City of Yuma*, 818 F.3d 493, 502 (9th Cir. 2016). In these types of disparate treatment claims, a plaintiff must prove that discriminatory intent motivated the defendant's actions under either the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), or with direct or circumstantial evidence of intent under "the 'sensitive' multi-factor inquiry articulated by the Supreme Court in *Arlington Heights v. Metropolitan Housing Corp.*, 429 U.S. 252, 266 (1977)." *Pac. Shores Props., LLC v. City of Newport Beach*, 730 F.3d 1142, 1158 (9th Cir. 2013). The second class of disparate treatment claims encompasses allegations that a policy or statute is facially discriminatory, meaning that its terms "appl[y] less favorably to a protected group." *Cmty. House, Inc. v. City of Boise*, 490 F.3d 1041, 1048 (9th Cir. 2007). Within this rubric, plaintiffs need not prove malevolent intent and any benign purpose behind the policy does not cure facial discrimination. *Id.* at

1049 (citing *Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am., UAW v. Johnson Controls, Inc.*, 499 U.S. 187, 199 (1991)). Facial discrimination does not violate the FHA, however, if the defendant shows either: "(1) that the restriction benefits the protected class or (2) that it responds to legitimate safety concerns raised by the individuals affected, rather than being based on stereotypes." *Id.* at 1050.

Because Congress designed the FHA to not only prohibit housing decisions and policies based on explicit discrimination, but to also "uncover unconscious or consciously hidden biases" and remove barriers to "housing and integration that can occur through unthinking, even if not malignant, policies," it also encompasses a claim for disparate impact. *Ave. 6E Invs.*, 818 F.3d at 502–03. To make out a prima facie case of disparate impact, a plaintiff must demonstrate "(1) the occurrence of certain outwardly neutral . . . practices, and (2) a significantly adverse or disproportionate impact on persons of a particular [type] produced by the [defendant's] facially neutral acts or practices." *Pfaff v. HUD*, 88 F.3d 739, 745 (9th Cir. 1996) (alterations in original) (quoting *Palmer v. United States*, 794 F.2d 534, 538 (9th Cir. 1986)). "Demonstration of discriminatory intent is not required under disparate impact theory. However, a plaintiff must 'prove the discriminatory impact at issue; raising an inference of discriminatory impact is insufficient.'" *Gamble*, 104 F.3d at 306 (9th Cir. 1997) (quoting *Pfaff*, 88 F.3d at 746). Thus, statistical evidence is required in order to prevail on a disparate impact claim. *Budnick v. Town of Carefree*, 518 F.3d 1109, 1118 (9th Cir. 2008). "A defendant may rebut a plaintiff's proof of disparate impact by 'supply[ing] a legally sufficient, nondiscriminatory reason.'" *Id.* (alteration in original) (quoting *Affordable Hous. Dev. Corp. v. City of Fresno*, 433 F.3d 1182, 1194 (9th Cir. 2006)).

Finally, a defendant may also violate the FHA by failing to make reasonable accommodations. *Id.* at 1119. To establish a claim on this theory, a person suffering from a disability must show that the defendant knew or reasonably should have known of his or her disability, the accommodation was necessary to afford the plaintiff an equal opportunity to use and enjoy the dwelling, and the defendant refused to make the accommodation. *Id.*

Where the sought-after accommodation is a fee waiver, a court should typically examine factors such as "the amount of fees imposed, the relationship between the amount of fees and the overall housing cost, the proportion of other tenants paying such fees, the importance of the fees to the landlord's overall revenues, and the importance of the fee waiver to the handicapped tenant." *United States v. Cal. Mobile Home Park Mgmt. Co.*, 29 F.3d 1413, 1418 (9th Cir. 1994).

In view of these principles, the Court has several observations about the merits arguments made at this stage. The Court first observes that Plaintiff's reasonable accommodation claim is not very intuitive. Essentially, Plaintiff appears to be arguing that the accommodation necessary to enjoy the housing is a free license. (Doc. 11 at 14). Seemingly, that takes the case out of the realm of *California Mobile Home Park Management*, which involved fees imposed by a landlord for guest parking. 29 F.3d at 1415. The analogy between guest parking fees and licensing fees is not a clean one. If Plaintiff desires to continue pressing this argument, it should strive to develop it in more detail. Specifically, Plaintiff must explain how a fee waiver "will affirmatively enhance a disabled [person's] quality of life by ameliorating the effects of the disability." *Montano v. Bonnie Brae Convalescent Hosp., Inc.*, 79 F. Supp. 3d 1120, 1126 (C.D. Cal. 2015) (quoting *Dadian v. Vill. of Wilmette*, 269 F.3d 831, 838 (7th Cir. 2001)). The Court also agrees with Defendants that Plaintiff has not adequately developed its disparate impact argument beyond rehearsing caselaw. (Doc. 16 at 11). At this stage, Plaintiff has no statistical evidence of disparate impact. It must provide statistical evidence to support this claim should it continue to press it in any request for a preliminary injunction.

Unlike disparate impact claims, however, a plaintiff need not supply statistical evidence to succeed on a disparate treatment claim. Thus, the Court disagrees with Defendants' contention that Plaintiff must support its disparate treatment claim—and most especially its claim that these statutes and rules are facially discriminatory—with the same evidence needed to support a disparate impact claim. (Doc. 16 at 10). It is not at all clear why Plaintiff cannot attempt to prove its facial discrimination claim by pointing to other

licensing statutes and rules and demonstrating that the regulatory scheme singles out persons recovering from alcoholism or drug addiction for the most onerous treatment. To the extent Defendants argue it cannot, they must support that contention with authority other than their citation to *Avenue 6E Investments*, which is clearly from the portion of that opinion discussing disparate impact claims.

Likewise, the Court is also somewhat confused by Defendants' novel claim that the text of A.R.S. §36-2062(A) cannot be facially discriminatory because it only makes mandatory certain voluntary standards of Plaintiff's parent organization, the National Alliance for Recovery Residences. (Doc. 16 at 11). To the extent that Defendants argue this shows the benign intent behind the law, the caselaw could not be clearer that this does not transform a facially discriminatory policy into a neutral one. Defendants also cite these standards in briefly arguing that, even if the statutes are discriminatory, they are justified. (*Id.* at 12). Because *Community House* rejected mere rationality as the standard to evaluate justifications of facially discriminatory policies, and adopted a "more searching method of analysis," 490 F.4d at 1050, the Court does not believe it can simply take Defendants' word for it that these policies benefit the protected class, *see, e.g.*, *Larkin v. State of Mich. Dep't. of Soc. Servs.*, 89 F.3d 285, 292 (6th Cir. 1996) (striking down neighborhood notification requirements for group homes because such a policy "would facilitate the organized opposition to the home, and animosity towards its residents"). Going forward, Defendants should provide legal authority for their contention that transforming voluntary standards into mandatory ones is not facially discriminatory or cite evidence that the policy benefits persons recovering from alcoholism or drug addiction.

/ / /
/ / /
/ / /
/ / /
/ / /
/ / /

### III. CONCLUSION

Therefore,

IT IS ORDERED that Plaintiff Arizona Recovery Housing Association's Motion for a Temporary Restraining Order (Doc. 11) is DENIED.

Dated this 27th day of May, 2020.

_____
James A. Teilborg
Senior United States District Judge